UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIDELITY AND DEPOSIT COMPANY OF,
MARYLAND, in its own right and as subrogee
and assignee of various obliges and claimants,

                                              Case No. 04-72643

      Plaintiff,                            Honorable Lawrence P. Zatkoff

vs.

A-MAC SALES & BUILDERS COMPANY, a
Michigan corporation, ANDREW G. McLEMORE,
individually, and ANDREW G. McLEMORE, as
Personal Representative of the ESTATE OF
DOROTHY McLEMORE,

      Defendants,

and

A-MAC SALES & BUILDERS COMPANY, a
Michigan corporation,

      Third-Party Plaintiff,

vs.

THE CITY OF DETROIT HOUSING
COMMISSION, a Municipal corporation,

      Third-Party Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on June 5, 2006

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Plaintiff Fidelity and Deposit Company of Maryland's

Motion for Summary Judgment (Docket #33).  Defendants A-MAC Sales & Builders Company ("A-

Mac"), Andrew G. McLemore, individually and as the Personal Representative of the Estate of

Dorothy McLemore (collectively, the "Indemnitors") filed a response, to which Plaintiff has replied.

The Court finds that the facts and legal arguments pertinent to Plaintiff's Motion are adequately

presented in the parties' papers, and the decisional process will not be aided by oral arguments.

Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the Motion be

resolved on the briefs submitted, without this Court entertaining oral arguments.  For the reasons

that follow, Plaintiff's Motion for Summary Judgment is GRANTED.

## II.  BACKGROUND

The parties have provided the Court with an extensive history of the relationship between

Plaintiff, A-Mac and Third-Party Defendant (The City of Detroit Housing Commission) (hereinafter

"DHC").  Set forth below are the facts critical to deciding Plaintiff's Motion.

On November 21, 1994, the Indemnitors executed an Agreement of Indemnity (the

"Indemnity Agreement") in favor of Plaintiff.  In consideration for and in reliance upon the

Indemnity Agreement and the promises, covenants and agreements set forth therein, Plaintiff issued

payment and performance bonds naming Plaintiff as surety for its principal, A-Mac, in connection

with A-Mac's construction for DHC of a project known as the Jeffries West Apartments (the

"Project") pursuant to Contract Number 1653, executed by DHC and A-Mac (the "Contract").  The

2

labor and material payment bond (the "Payment Bond") was issued by Plaintiff at the request of A-Mac.  The Payment Bond obligated A-Mac, as the contractor, and Plaintiff, as the surety, to promptly pay "…all claimants supplying labor or materials to the contractor or the contractor's subcontractors in the prosecution of the work."  Plaintiff also issued a performance bond, pursuant to which Plaintiff was obligated to complete the Project under certain conditions discussed below (the "Performance Bond").

The initial Notice to Proceed for the Project was issued to A-Mac on October 12, 1995. Beginning in February of 2000, DHC began notifying Plaintiff of concerns it had with respect to A-Mac's ability to finish the Project. At that time, Plaintiff also began investigating the status of the Project, along with A-Mac's ability to complete the Project.  Even as Plaintiff was investigating DHC's claims with respect to A-Mac's construction of the Project, Plaintiff began to receive claims against its Payment Bond for the Project. A-Mac's subcontractors were claiming that A-Mac had been paid for their work by DHC but had failed to turn that money over to the subcontractors and suppliers for whom the payment had been made.

On August 21, 2000, DHC (1) cited numerous contractual failures by A-Mac, (2) declared A-Mac in default of its contract for the Project, and (3) notified A-Mac of its intent to terminate A-Mac's right to complete the work covered by the Contract. Among other things, DHC cited A-Mac's failure to supply sufficient workers, materials and equipment to perform the work.  On August 25, 2000, A-Mac requested that Plaintiff pay A-Mac's subcontractors approximately $270,000.00 in connection with the Project. A-Mac also represented that its subcontractors would return to work, which they never did, despite the payments by Plaintiff.

On September 15, 2000, DHC terminated the Contract for the Project for cause and made

3

a demand upon Plaintiff to honor Plaintiff's obligations under the Performance Bond. Among other

things, DHC terminated the Contract because of A-Mac's failure to complete work within the

corresponding time frames under the Contract and for A-Mac's failure to give DHC "reasonable and

credible assurance that A-Mac has the present capacity and intent to complete the Project."  On

September 15, 2000, DHC also notified Plaintiff that it had received and reviewed a "plan of

assurance" from A-Mac for completion of the Project and found it to be unacceptable. Deficiencies

in the "plan of assurance" identified by DHC were that:

1.      It lacks an accounting of specific amounts claimed by
        subcontractors and suppliers as due and owing for completed
        work;

2.      It fails to provide credible, unqualified commitments from
        critical subcontractors indicating their willingness to return to
        work and proceed expeditiously to complete their portions of
        the work; and

3.      It does not include critical path information to explain the
        sequencing of subcontractor work.

At the same time, A-Mac and its attorneys were telling Plaintiff that A-Mac's termination on the

Project was probably "an oversight or misunderstanding."  A-Mac was informed that Plaintiff was

accepting proposals for completion of the Project and if A-Mac wished to submit its own proposal

to complete the Project, A-Mac should do so promptly.  A-Mac maintains that it submitted a

proposal (the Comprehensive Plan for Completion) for completing the Project on October 30, 2000.

On March 27, 2001 Plaintiff entered into a Completion Contract with Filmore Construction

Company to complete the Project.  On April 5, 2001, after several months of negotiation concerning

its terms, a Takeover Agreement was entered into between Plaintiff and DHC for completion of the

Project.  During that time,  Plaintiff investigated the amount claimed by each subcontractor or

2:04-cv-72643-LPZ-RSW   Doc # 52   Filed 06/05/06   Pg 5 of 14   Pg ID 1208

supplier and determined A-Mac had failed to pay the following amounts for work previously performed by such subcontractors and suppliers (totaling $610, 947.78):

> Progressive Mechanical, Inc. $262,915.69
>
> Partlan-Labadie Sheet Metal Co. $30,700.00
>
> Di-Mar, Inc. $190,636.89
>
> CSA Electric, Inc. $110,995.20
>
> Scaffolding, Inc. $14,700.00

As a result, Plaintiff made payments in the such amounts pursuant to the Payment Bond.  Plaintiff also paid out $2,457,662.00 to complete the Project pursuant to the Performance Bond.  Plaintiff received contract funds of $2,276,949.00 from DHC, resulting in a loss of $180,713.00 to Plaintiff in connection with the performance of the work necessary to complete the Project.

Despite numerous demands from Plaintiff, the Indemnitors have failed to pay Plaintiff for completing the Project and paying A-Mac's debts in connection with the Project. In July 2004, Plaintiff filed this action for Breach of Contract (Count I), Exoneration and Reimbursement (Count II), Specific Performance of the Indemnity Agreement (Count III), Injunctive Relief (Count IV), and Declaratory Judgment (Count V).  Plaintiff now moves for summary judgment against all of the Indemnitors.

### III.  LEGAL STANDARD

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support, show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law.

*See* FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted).  In application of this summary judgment

standard, the Court must view all materials supplied, including all pleadings, in the light most

favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986).  "If the evidence is merely colorable or is not significantly probative,

summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its

motion and identifying those portions of the record that establish the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met

its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts

to demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S.

at 324.  The nonmoving party must do more than show that there is some metaphysical doubt as to

the material facts.  It must present significant probative evidence in support of its opposition to the

motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v.*

*Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).


### IV.  ANALYSIS

When the terms of a contract are unambiguous, their interpretation is a question of law for

the Court. *Mt. Carmel Mercy Hosp. v. Allstate Ins. Co*., 194 Mich App 580, 588 (1992). An

indemnity contract is construed in the same fashion as contracts generally. *Zurich Ins. Co. v C.C.R.*

*and Co*., 226 Mich.App. 599, 603 (1997).  In this case, each of the Indemnitors executed the

Indemnity Agreement in favor of Plaintiff.  The express terms of the Indemnity Agreement provide,

in part, that the Indemnitors are required to:

Pursuant to the second paragraph of the Indemnity Agreement:

> SECOND: The Contractor and Indemnitors shall exonerate, indemnify and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interests, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the surety may sustain and incur: (1) by reason of having executed or procured the execution of the Bonds, (2) by reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement, or (3) in enforcing any of the covenants and conditions of this Agreement. …

The Court finds that the Indemnity Agreement clearly and unambiguously states that Plaintiff is

entitled to reimbursement from the Indemnitors for any amount paid by reason of executing the

Bonds (Payment and Performance) and enforcing the Indemnity Agreement.

## A.    Payment Bonds

Plaintiff, as A-Mac's surety, issued a Payment Bond for the Project. By issuing this Payment

Bond, Plaintiff became obligated to pay A-Mac's subcontractors/suppliers in the event that they

were not paid and made a valid claim against the Payment Bond. As a result of allegedly not being

paid by A-Mac, several subcontractors and suppliers who previously had performed work for and

provided supplies on the Project made claims against the Payment Bond and demanded Plaintiff

fulfill its obligations as surety.

Plaintiff asserts, and Indemnitors do not contest, that Plaintiff and its consultant, Forcon

International, conducted investigations to determine the validity of such claims. After the

investigations, Plaintiff paid the subcontractors/suppliers $610,947.78, as described above.  Plaintiff

has provided the Court with the documentation submitted by these claimants in support of such

amounts, as well as copies of the payments made to the claimants by Plaintiff.  Accordingly, the

Court finds that there is no genuine issue of material fact that Plaintiff has incurred losses pursuant

to the payment of Payment Bond claims in the amount of $610,947.78.

The Court therefore holds that Plaintiff is entitled to judgment as a matter of law with respect

to the Indemnitors' duty under the Indemnity Agreement to indemnify Plaintiff for Plaintiff's losses

incurred pursuant to the Payment Bond.  Judgment in favor of Plaintiff shall be entered in the

amount of $610,947.78 with respect to payments made under the Payment Bond.[1]

**B.      Performance Bonds**

*1.      Liability*

Upon DHC's declaration that A-Mac was in default under the Contract and DHC's

termination of the Contract, Plaintiff, under the auspices of the Performance Bond, undertook to

complete the remaining portions of the Project.   The Court holds, as a matter of law, that Plaintiff

had the right to undertake and complete the Project in the manner that it did, pursuant to the terms

of the Takeover provision of the Indemnity Agreement, which provides:

> SIXTH: In the event of any breach or default asserted by the obligee in any said Bonds, or the Contractor has abandoned the work on or forfeited any contracts covered by any said Bonds, or has failed to pay obligations incurred in connection therewith…the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take

---

[1] The Court also notes that none of the Indemnitors ever asked Plaintiff to litigate the claims paid by Plaintiff under the Payment Bond, nor did any of the Indemnitors deposit cash or collateral with Plaintiff.  In order to preserve their right to contest the payments made pursuant to the Payment Bond, the Indemnitors were required to do so pursuant to Paragraph THIRTEENTH (SETTLEMENTS) of the Indemnity Agreement, as discussed below in Section IV.B.2.

> possession of any part or all of the work under any contract or
> contracts covered by any said Bonds, and at the expense of the
> Contractor and Indemnitors to complete or arrange for the completion
> of the same, and the Contractor and Indemnitors shall promptly upon
> demand pay to the Surety all losses, and expenses so incurred.

The terms of the Takeover provision of the Indemnity Agreement are clear and unambiguous.

Plaintiff, at its sole discretion, had the right to takeover the Project in the event DHC "asserted" that

A-Mac breached its contract with DHC _or_ declared A-Mac in default.  In this case, the undisputed

facts are that DHC both asserted a breach of contract by A-Mac and declared A-Mac in default.

First, pursuant to the Contract, DHC served upon A- Mac a "Notice of Default/Demand for

Assurance of Performance and Notice of Intent to Terminate for Cause" on August 21, 2000. The

Court finds that this Notice constituted an "assertion" that A-Mac was in default of its contractual

obligations under the Contract.  The Court also notes that A-Mac does not dispute that the Notice

constituted an assertion by DHC that A-Mac was in default under the Contract.

Second, DHC terminated the Contract on September 15, 2000, in a letter sent to A-Mac.  In

terminating A-Mac, DHC declared that A-Mac was in default and was being terminated for cause

because A-Mac failed "to complete contract work within the corresponding contract time specified

for completion of performance."  Furthermore, DHC stated that A-Mac's "plan of assurance" was

found "unacceptable and insufficient" and failed to provide "reasonable and credible assurance that

A-Mac has the present capacity and intent to complete the Project."  A-Mac does not dispute that

DHC notified A-Mac that DHC was terminating the Contract because A-Mac was in default.

Therefore, pursuant to the Takeover provision of the Indemnity Agreement, the Court finds

that DHC's assertion of default and DHC's termination of A-Mac provided Plaintiff the right to

"take possession of any or all or the work . . . covered by any said Bonds and . . . complete or

9

arrange for the completion" of the Project.[2]

The Indemnitors challenge Plaintiff's Motion on two grounds.  The Indemnitors first argue that Plaintiff "improperly" took over the Project because (1) A-Mac explained to Plaintiff the difficulties it encountered on the Project due to DHC's increased scope; (2) A-Mac explained to Plaintiff the importance of obtaining HUD approval for Change Order No. 5; (3) A-Mac explained why DHC's termination of A-Mac was improper; (4) A-Mac advised Plaintiff that 65% of the Project was already complete; (5) A-Mac submitted a detailed schedule for completion of the Project to Plaintiff; and (6) A-Mac summarized DHC's problems with HUD.  As discussed above, however, Plaintiff had the right under the Indemnity Agreement to takeover the Project upon the assertion by DHC that A-Mac breached the Contract or a declaration of default by DHC.  Plaintiff was not obligated to investigate DHC's statements or to accept Plaintiff's explanations that DHC was wrong.[3]

Secondly, and primarily for the reasons set forth in (1) - (6) above, the Indemnitors argue that Plaintiff "breached the implied covenant of good faith" owed to A-Mac under the Indemnity Agreement.  Controlling case law imposes only a good faith requirement on sureties exercising their rights under an indemnity agreement. *Transamerica Ins. Co. v. Bloomfield*, 401 F.2d 357 (1968);

---

[2]   The Court also notes that Plaintiff had the right to takeover the Project pursuant to the provision "or [A-Mac] has failed to pay any obligations incurred in connection therewith" under the Takeover provision.  A-Mac has not disputed that it failed to pay its obligations in connection with the Project, at least with respect to the five claims asserted against the Payment Bond.

[3] As discussed below, Plaintiff had good reason to believe DHC's statements were accurate based on Plaintiff's direct communications and relationship with A-Mac (which included repeated instances of A-Mac failing to provide Plaintiff with information Plaintiff had requested and been promised, as well as receipt of claims from subcontractors and suppliers on the Project who claimed that they had not been paid by A-Mac).

10

*Ohio Farmers Ins. Co. v. Marcelli Construction Co.*, 2001 Mich. App. LEXIS 2338, decided on

Nov. 9, 2001 (Docket No. 221502).  Here, even if the Court assumes for purposes of this Opinion

that all of the Indemnitors' assertions are true, the Court cannot find that Plaintiff acted in

contravention of the Indemnity Agreement, including any requirement of good faith.

As noted above, Plaintiff had sole discretion over whether to take over the Project upon

assertions by DHC that A-Mac breached the Contract and DHC's declaration that A-Mac was in

default of the Contract.  Neither of those instances required any other action by Plaintiff.  Second,

there are many events which occurred prior to and after DHC declared A-Mac in default which

demonstrate that Plaintiff acted in good faith in taking over the Project and not awarding it to

Plaintiff.  For example,

1.   While Plaintiff was investigating the claims of A-Mac's default by DHC and the claims of subcontractors and suppliers of A-Mac against the payment bond, A-Mac informed Plaintiff it did not have the financial wherewithal to complete the Project and did not have the financial wherewithal to pay its subcontractors and suppliers.

2.   A-Mac made at least one request for financial assistance to Plaintiff in June 2000. On June 23, 2000 Plaintiff acknowledged the request by A-Mac for financial assistance from Plaintiff "for the purpose of completing the Project and paying obligations to various subcontractors and suppliers of labor, material and services used in the performance of the work on such project incurred by A-Mac Sales and Builders, Inc."

3.   With respect to the foregoing request for funds from A-Mac, Plaintiff requested various information including a formal proposal as to the amount of funds required for completion of the work and the security A-Mac intended to offer Plaintiff with respect to repayment. The information requested was not provided by A-Mac.

4.   Plaintiff thereafter made numerous requests to A-Mac for various information. At the focus of those informational requests was a request by Plaintiff for complete information from A-Mac concerning amounts owed to subcontractors and suppliers on the Project to date. Based on statements from subcontractors and suppliers, as well as Plaintiff's investigations, it was becoming increasingly clear that A-Mac had been paid for work performed by those subcontractors and suppliers but had failed to use the money to pay the subcontractors and suppliers.

5.      The failure to pay the subcontractors and suppliers was leading to a refusal by those companies to continue to perform on the Project; the Project was falling further behind.  Moreover, A-Mac was unable to provide any information concerning a source of financing which would allow it to continue to perform the Project.

6.      In July of 2000, Plaintiff made a written request that it be allowed to review the book and records of A-Mac. No response was forthcoming.

7.      Although A-Mac eventually met with Plaintiff representatives, A-Mac did not provide access to its books and records despite earlier promises to do so. On August 8, 2000, Plaintiff reminded A-Mac that during the earlier meeting A-Mac had agreed to allow a review of its books and records for the Project but it had still refused access to those books and records.

Significantly, the Indemnitors do not dispute any of the foregoing matters.  Accordingly, the Court finds that the Indemnitors have offered no basis for concluding that Plaintiff did not act in good faith in taking over the Project (assuming that there was such an implied covenant of good faith).

*2.      Damages*

The Indemnity Agreement clearly states that the Surety must be reimbursed "promptly upon demand" for any and all losses and expenses incurred in completing the work.  Plaintiff has submitted evidence that it paid $2,457,662.00 to complete the Project pursuant to Indemnity Agreement and the Performance Bond.  After being paid $2,276,949.00 by DHC, Plaintiff has losses of $180,713.00 in connection with completing the Project.  The Indemnitors do not contest that Plaintiff paid out $180,713.00 more to complete the Project than they were paid by DHC.  Rather, the Indemnitors argue that Plaintiff failed to mitigate damages in completing the Project.

The Indemnitors contend that Plaintiff failed to mitigate damages because Plaintiff ignored A-Mac's Comprehensive Plan for Completion and used a different contractor to complete the Project.  The Court agrees with the Indemnitors that the law requires a party to make a reasonable effort to minimize the damages suffered, *Williams v. Amer. Title Ins. Co.*, 83 Mich.App. 686, 697

12

(1978), and the question of the adequacy of the mitigation of damages generally is a matter for the fact finder to determine, *Summit Petr. Corp. v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990). In this case, however, even if there is a genuine issue of material fact as to whether Plaintiff fulfilled its duty under the law, Defendant's failure to comply with the terms of the Indemnity Agreement (as discussed in the ensuing paragraph) constitutes a bar to this argument.

The Settlements provision of the Indemnity Agreement provides:

> THIRTEENTH: The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgment rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

The Court finds that the Settlements provision is clear and unambiguous: Plaintiff has the right to settle or compromise any claim or demand made upon the Payment and Performance Bonds, *unless A-Mac and the Indemnitors request that Plaintiff litigate such claims and secure that right by depositing cash or collateral with Plaintiff at the time of the request.* None of the Indemnitors ever asked Plaintiff to litigate the payments made by Plaintiff in fulfilling the Performance Bond or to litigate the failure of DHC to fully reimburse Plaintiff for Plaintiff's expenses incurred in completing the Project. Moreover, none of the Indemnitors ever deposited cash or collateral to preserve those rights. Furthermore, the record even demonstrates that Plaintiff asked A-Mac numerous times to provide collateral under the Performance Bond, but A-Mac never did so.

Accordingly, the Court finds that A-Mac's failure to comply with the terms of the Indemnity Agreement with respect to Plaintiff's cost of completing the Project bar the Indemnitor's claim that

Plaintiff failed to mitigate its damages in completing the Project under the Performance Bond.  The

Court therefore concludes that, as a matter of law, Plaintiff is entitled to judgment in the amount of

$180,713.00 for losses incurred in fulfilling the Performance Bond.


## V.  CONCLUSION

Accordingly, and for the reasons set forth above, the Court hereby GRANTS Plaintiff's

Motion for Summary Judgment.  Specifically, the Court holds that:

A.      The Indemnitors are liable to Plaintiff for all amounts paid by Plaintiff to

subcontractors and suppliers pursuant to the Payment Bond, to wit $610,947.78.

B.      The Indemnitors are liable to Plaintiff for the losses incurred by Plaintiff to complete

the Project pursuant to the Performance Bonds, to wit $180,713.00.

In addition, the Court hereby ORDERS Plaintiff to submit, within 20 business days of the date of

this Opinion and Order, its documented claim for the attorney fees to which it believes it is entitled

under the Indemnity Agreement.

IT IS SO ORDERED.

 s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
Date: June 5, 2006                          UNITED STATES DISTRICT JUDGE

S:\Marie ECF\Fidelity Motion.wpd

14