UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIDELITY AND DEPOSIT COMPANY OF,
MARYLAND, in its own right and as subrogee
and assignee of various obliges and claimants,

        Case No. 04-72643

    Plaintiff,        Honorable Lawrence P. Zatkoff

vs.

A-MAC SALES & BUILDERS COMPANY, a
Michigan corporation, ANDREW G. McLEMORE,
individually, and ANDREW G. McLEMORE, as
Personal Representative of the ESTATE OF
DOROTHY McLEMORE,

    Defendants,

and

A-MAC SALES & BUILDERS COMPANY, a
Michigan corporation,

    Third-Party Plaintiff,

vs.

THE CITY OF DETROIT HOUSING
COMMISSION, a Municipal corporation,

    Third-Party Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on

PRESENT:   THE HONORABLE LAWRENCE P. ZATKOFF
                 UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Third-Party Defendant City of Detroit Housing Commission's ("DHC") Motion to Dismiss (Docket #36). Third-Party Plaintiff A-MAC Sales & Builders Company ("A-MAC") has filed a response and DHC has replied. The Court finds that the facts and legal arguments pertinent to DHC's Motion are adequately presented in the parties' papers, and the decisional process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, DHC's Motion to Dismiss is DENIED.

## II. BACKGROUND

### A. DHC's Version of the Facts

On September 27, 1995, Construction Contract No. 1653 (the "Contract") was entered into between the City of Detroit and A-MAC in conjunction with the construction of the Jeffries West project (the "Project"). At that time, DHC was a department of the City of Detroit and referred to as the Detroit Housing Department. All operations and employees were under the province of the City of Detroit. In 1995, all contracts entered into by DHC had to be made in the name of the City of Detroit and follow the City's procurement guidelines. In addition, all contracts that are procured with federal funds must follow federal procurement procedures. The scope of work on the Contract later was enhanced and Change Order No. 1 changed the price, added additional work and provided a new time for the Contract to be substantially completed. Several change orders occurred for extensions of time through August 30, 1999, and A-MAC was not penalized or held responsible for

delays occurring as a result those changes.

On July 7, 1999, A-MAC was cited by DHC for failing to have skilled workers *(i.e.*, steel erectors, plumbers and electricians) on the Project because A-MAC failed to pay its subcontractors. DHC wrote to A-MAC on August 11, 1999, to request a meeting between the parties to address and finalize outstanding issues of non-payment of subcontractors, additional subcontractor cost, additional cost to complete the Project and extended general conditions by A-MAC. On August 12, 1999, a follow-up letter to DHC's July 7, 1999, letter was sent to A-MAC representative Zelman Colbert indicating that DHC had not received a response on how A-MAC was going to regain the loss schedule time due to subcontractor walk-offs. Progress on the Project had slowed to a point that the Contract's completion was jeopardized. On August 27, 1999, DHC once again contacted A-MAC detailing other information needed in order to consider A-MAC's request for a change order in time and cost. Finally, on September 2, 1999, upon the proposal of A-MAC, DHC authorized, with the approval of City Council, Change Order No. 4 for extension of time to complete the Contract. The new completion date was to be February 16, 2000. DHC concluded that the delays were caused by A-MAC because A-MAC had failed to pay subcontractors, failed to properly schedule work items and contractors, and was slow in progressing the work.

Change Order No. 5 requested an increase in the contract amount of $474,310.00. The United States Department of Housing and Urban Development ("HUD") provided the funds requested in Change Order No. 5 on or around March 10, 2000 (although HUD did not approve Change Order No. 5 at that time and conditioned the advance of the funds with the caveat that the City would have to reimburse the funds if later findings proved that the change order was unjustified). On December 7, 1999, A-MAC was cited for not making progress on the Contract.

Specifically, DHC stated that A-MAC failed to participate in weekly construction progress meetings, which were critical to avoiding time constraints. Manpower on the Project also was an issue, as the average labor force had only been two electricians and one laborer, which DHC maintained was inadequate to complete the Project. DHC asserted that certified weekly payrolls had not been submitted since October 25, 1999, which could have delayed A-MAC's ability to submit an Application for Payment. DHC also claimed that A-MAC had failed to obtain all necessary permits for the project. A-MAC's response to DHC's complaints was to inform DHC that A-MAC needed $476,000 advanced as A-MAC was unable to continue to properly manage the project because A-MAC lacked a credit line. A-Mac and DHC continued to be unable to resolve the problems, as set forth in February 14, 2000 and March 1, 2000 letters received prepared by DHC to A-MAC.

In October 1995, the original amount of Contract No.1653 was $3,617,000.00. The Contract value eventually was increased to $6,341,310.66, as Change Order No. 1 increased the Contract by $2,250,000.00 on July 3, 1996, and Change Order No. 5 increased the Contract by $474,310.66. DHC asserts that prior to June 26, 2000, A-MAC was paid substantially all of the money A-MAC was owed by DHC under the Contract but that A-MAC failed to pay its subcontractors even though it had been paid. Because of A-MAC's failure to pay its subcontractors, five of the six subcontractors walked off the job causing further delays. DHC asserts that it attempted to resolve the issues with A-MAC on many occasions, including advancing substantially the entire amount authorized under Change Order No. 5, to no avail.

A-MAC allegedly failed to provide any good faith effort in trying to complete the contract. For instance, A-MAC was to appear at construction meetings and failed to have a representative present. A-MAC never came forth with a plausible plan to complete the Contract or any valid reason

why it could not, despite A-MAC having received all of its money (except what was being retained under the terms of the Contract). Subcontractors continued filing claims against the project referencing the Contract as late as September 2000. DHC gave A-MAC several opportunities to cure the defects in the contract, but A-MAC was either unable or unwilling to do so. DHC asserts that it continued to attempt to resolve the problems with A-MAC. On August 21, 2000, DHC declared A-MAC in default for cause and looked to Plaintiff Fidelity and Deposit Company of Maryland ("Fidelity") for completion of performance and payment of subcontractors (since DHC believed A-MAC had already been paid for work performed by the subcontractors).

Prior to declaring A-MAC in default, DHC responded to a letter from A-MAC wherein A-MAC stressed the urgency of issuing Change Order No. 5. A-MAC was informed that DHC had advanced all but $65,632.43 of Change Order No. 5 but work had not been completed satisfactorily, that $351,748 worth of work had yet to be completed, and that credits in the amount $308,719 were owing to DHC from A-MAC. DHC claims it also had received additional complaints from subcontractors for non-payment although A-MAC had received payment for work performed. DHC terminated the Contract for cause on September 15, 2000.

A-MAC took no legal action from the time it was declared in default in 2000 until it filed a complaint against DHC in 2005. DHC asserts that during this period of time, DHC suffered a fire at one of its storage facilities where old documents were stored and key employees have left the agency.

**B.     A-MAC's Version of the Facts**

During the course of the Project, A-MAC asserts that the DHC caused continual delays, preventing A-MAC and its subcontractors from completing their work and from being compensated

5

for their work in a timely manner. Specifically, the DHC increased the scope of the Contract from $3.6 million contract by over $6 million pursuant to Change Order No. 1 and Change Order No. 5. More significantly, A-MAC claims that the delays associated with Change Order No. 5 were prejudicial to A-MAC. A-MAC asserts that Change Order No. 5 had substantial additions, deletions and changes without sufficient compensation for these changes. And, while DHC submitted Change Order No. 5 to HUD for approval in November 1999, A-MAC asserts that HUD delayed over one year in approving it. As a result, A-MAC contends that it and its subcontractors could not proceed with a substantial portion of their work pending approval of this significant change order.

A-MAC asserts that DHC wrongfully held A-MAC in default and terminated the Contract because the modifications in Change Order No. 5 had not been approved by the DHC or HUD at any time between the Change Order No. 5 request in November 1999, and the time when A-MAC was improperly terminated.

On April 5, 2001, the DHC executed a Takeover Agreement with Fidelity without providing any notice to A-MAC. A-MAC contends that the Takeover Agreement specifically recognizes the significance of Change Order No. 5:

> The Owner [DHC] represents that it has approved Change Order Number 5 to the Original Contract in addition to Change Order Nos. 1-4, and that for purposes of this Agreement the deletions identified in Change Order Number 5 are to be deleted and the additions identified are to be performed. Owner further represents and warrants that it has received HUD approval as to Change Order Nos. 1-5 in all of their particulars.

In addition, A-MAC believes the Takeover Agreement recognizes the difficulties that DHC and HUD caused A-MAC, as it contains a material breach provision related to problems with HUD approval and payment:

6

> The Owner further represents and warrants that funds sufficient to cover the Contract Balance, as defined above, have been encumbered and allocated to cover the cost of completing the Original Contract and Modifications and that the Owner has obtained all necessary authorizations and approvals to expend said funds for such purpose. It is, however, mutually understood and agreed that said funds are currently in the possession of the U.S. Department of Housing and Urban Development and that access thereto is subject to HUD's approval of Owner applications for disbursement thereof for completed and accepted work. It is further understood and agreed that HUD's failure to timely provide access to and payment of those funds to Surety pursuant to Owner applications shall constitute a material breach of this Agreement and default hereunder by Owner entitling Surety to stop work and declare a default hereunder and to seek such other relief as is available pursuant to law and/or equity.

### III. LEGAL STANDARD

**A.     Standard of Review under Fed. R. Civ. P. 12(b)(6)**

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of the plaintiff's complaint. The Court must accept as true all factual allegations in the complaint, and any ambiguities must be resolved in the plaintiff's favor. *Jackson v. Richards Medical Co.*, 961 F.2d 575, 577 (6th Cir. 1992). A district court's grant of a motion to dismiss is proper when there is no set of facts that would allow the plaintiff to recover. *Carter by Carter v. Cornwall*, 983 F.2d 52, 54 (6th Cir. 1993).

**B.     Standard of Review under Fed. R. Civ. P. 56**

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support, show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence

7

favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted).  In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.  The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts.  It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV.  ANALYSIS

### A.    DHC is a Proper Party

In its Motion to Dismiss, DHC claims that it is not a proper party to this litigation.  DHC maintains that only the City of Detroit (through its Council) could bind the City of Detroit when the Contract was executed in 1995, and that the City of Detroit (and not DHC) would be the proper third-party defendant here.  In support of its Motion, DHC relies on Fed. R. Civ. P. 12(b)(6) (for

failure to state a claim upon which relief can be granted) and Fed. R. Civ. P. 21, which provides as follows:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

The Court is not familiar with, nor does it agree with (and DHC offers no authority for its position), the unique grounds for dismissal asserted by DHC pursuant to Rule 21.

In the event DHC is not a proper party, the Court agrees that it would be entitled to dismissal of this action pursuant to Rule 12(b)(6). In this case, however, the Court is not persuaded by DHC's argument that it is not a proper party to this action. First, DHC has admitted in pleadings in this matter that "DHC was the Owner of the project known as the Jeffries West Apartments Building 502-Modernization Reconfiguration (the "Project"). A-MAC was the general contractor on the Project." *See DHC's Answer to Third Party Complaint (Docket #13 at ¶ 3)*. Second, the Takeover Agreement entered into between DHC and Fidelity on April 5, 2001, specifically provides that DHC is the Owner and that "the Owner entered into a contract [Contract No. 1653] dated September 27, 1995" with A-MAC. Even if, as DHC claims, it was not a party to the Contract when it was executed in 1995, the foregoing statements demonstrate that DHC became the party responsible for the Contract. DHC's representations that it separated from the City of Detroit only buttress a finding that DHC is a proper party to this lawsuit. Finally, the Court notes that DHC did not submit any evidence that it did not assume responsibility and liability for the Project (*e.g.,* an Agreement with the City to that effect).

For the above reasons, the Court concludes that DHC is a proper party to this action.

Accordingly, DHC's Motion to Dismiss pursuant to Rules 12(b)(6) and 21 is DENIED.

**B.     Rule 56 - Genuine Issue of Material Fact**

DHC next argues that DHC made "substantial payment to A-MAC . . . and did everything it could to assist A-MAC in obtaining payments for services performed." DHC states that A-MAC admittedly did not pay its subcontractors on the Contract or provide DHC with the credits it owed DHC. DHC also asserts that A-MAC did not complete the Project even though funds were advanced to A-MAC to help it pay subcontractors. Finally, DHC asserts that A-MAC did not "prove" any justifiable reason for the delay in the Contract, nor did A-MAC plead any facts to substantiate a breach by the DHC or the City of Detroit. DHC maintains that the facts demonstrate that DHC acted in good faith by making attempts to work for a very long time with A-MAC to bring the project to completion.

The Court is not persuaded by DHC's argument. First, DHC does not even argue that it fully satisfied all of its obligations to A-MAC under the Contract. Rather, DHC claims that it "substantially complied" with the terms of the Contract paid A-MAC and did all that it could to assist A-MAC in obtaining payments. The Court is not persuaded that such claims, even if supported, demonstrate that there is not a genuine issue of material fact. A-MAC has asserted, and DHC has not rebutted, that the delays in HUD approving Change Order No. 5 resulted in A-MAC and its subcontractors being unable to begin/complete certain jobs. As such, the lack of approval for Change Order No. 5 may have hindered A-MAC's ability to complete its responsibilities, notwithstanding DHC's claims that it had made payments to A-MAC. In addition, the fact that a Change Order No. 5 was necessary (including the necessity for additional funds and a change in scope of the Project) demonstrates that there were issues between the parties that required

modification to the Contract as it existed through Change Order No. 4.  These are issues for the fact finder to determine when weighing the facts involved, not for the Court to decide pursuant to Fed. R. Civ. P. 56.

For the reasons set forth above, the Court DENIES DHC's "Motion to Dismiss" pursuant to Fed. R. Civ. P. 56.  The questions of whether DHC had the right to terminate the Contract and whether A-MAC was in default under the Contract are issues of fact for the jury.

**C.     Laches**

Finally, DHC asserts that laches bars A-MAC's claims against DHC.  "Dismissal of a claim on the ground of laches requires that there be (1) an unreasonable and unexcused delay in bringing the claim, and (2) material prejudice as result of the delay." *U.S. v. Hanserd,* 1998 WL 228168, at **2 (6th Cir. 1998) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992)(*en banc*)).

DHC asserts that A-MAC's  failure to take action against the DHC for five years from the time A-MAC defaulted under the Contract is unreasonable because A-MAC knew about its claims the whole time.  DHC contends this delay has prejudiced any defense that DHC has because during that five year period: (1) the official separation between the City of Detroit and DHC occurred, (2) in 2005, there was a fire in one of the storage facilities where DHC archived many of its documents, and (3) John Nelson, the former Executive Director of DHC and a critical component of DHC's defense against A-MAC, ceased his employment with DHC and his whereabouts are unknown.

The Court again finds DHC's argument without merit, as DHC does not satisfy either element necessary for a laches defense.  First, the Court finds that A-MAC's "delay" in bringing this action was reasonable and excusable.  Until such time as Fidelity brought an action against A-MAC,

A-MAC likely would have had no reason to bring suit against DHC. Moreover, A-MAC filed this action against DHC promptly after A-MAC was sued by Fidelity. As noted by A-MAC, until such time as Fidelity completed the Project with DHC under the Takeover Agreement, Fidelity did not know (and therefore A-MAC could not know) the damages involved.

Second, the Court finds that DHC has not demonstrated any prejudice to DHC as a result of this action being filed in 2005. DHC has not made a single allegation that any document relating to this action was in the facility where the fire occurred, nor has DHC even asserted that any of the destroyed or burned items therein were related to this case. In addition, DHC claims that is prejudiced because it cannot find its former Executive Director, John Nelson, are disingenuous, at best. A-MAC correctly notes that DHC did not explain what information Mr. Nelson may have that is crucial to this case. In addition, A-MAC exposed DHC's apparent lack of effort in searching for Mr. Nelson by providing Mr. Nelson's address, phone and fax number in A-MAC's response brief after finding the same on the Internet. Finally, although DHC may have formally separated from the City of Detroit since the Contract was executed (DHC does not specify when), DHC does not explain what prejudice it has suffered as a result. The Court also notes that both the City of Detroit and DHC continue to operate and maintain offices in the City of Detroit.

For the foregoing reasons, the Court holds that DHC is not entitled to dismissal of this action pursuant to a defense of laches.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, the Court hereby DENIES DHC's Motion to Dismiss.

IT IS SO ORDERED.

 s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
Date: June 5, 2006                              UNITED STATES DISTRICT JUDGE


S:\Marie ECF\DHC Motion to Dismiss.wpd